UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
                               )
ARIANA BREITMEYER-SCHAAL,      )
                               )
        Plaintiff,             )
                               )
        v.                     )    Case No. 2:14-cv-197
                               )
CAROLYN W. COLVIN, Acting      )
Commissioner of the Social     )
Security Administration,       )
                               )
        Defendant.             )
                               )
```

**OPINION AND ORDER**

Plaintiff Ariana Breitmeyer-Schaal brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (ECF No. 17) and the Commissioner's motion to affirm the same (ECF No. 25). For the reasons stated below, Plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

## Background

Plaintiff applied for DIB and SSI on June 1 and June 6, 2011, respectively. Both applications were denied initially and upon reconsideration. An ALJ issued an unfavorable decision on January 16, 2013. The SSA Appeals Council subsequently declined

review, thus rendering the ALJ's decision the final decision of the SSA Commissioner.  Plaintiff is proceeding in this case *pro se*.

## I.   Plaintiff's Medical History

On May 31, 2008, at the age of 23, Plaintiff underwent Cesarean section (C-section) surgery.  Plaintiff reports that she was fully functional before the surgery, but had not worked since 2006 because she was attending school.  Adhesions resulting from the C-section have allegedly left her in severe pain and unable to exert physically.  Plaintiff also claims that her pain impedes her ability to concentrate.

In the months following her C-section, Plaintiff began developing radiating pain in the right side of her abdomen.  On March 31, 2009, she sought care at the Emergency Room at Stony Brook Medical Center in New York.  On April 23, 2010, after moving to Vermont, she again sought Emergency Room services because of her pain.  At that time she was prescribed narcotics and advised to make an appointment with an OB/GYN.

On April 27, 2010, Plaintiff met with Dr. Kym Boyman, who became her treating OB/GYN.  Dr. Boyman performed an ultrasound but was apparently unable to identify the source of the pain, ruling out a prior ovarian cyst.  In September 2010, Plaintiff required immediate surgery due to an ectopic pregnancy.  Dr. Boyman performed the surgery and discovered multiple adhesions of

2

the uterus and the abdominal wall.  While Dr. Boyman was able to both photograph and cut through some of the adhesions, the surgery was ended because Plaintiff began to suffer blood loss.

During a September 27, 2010 post-operative call from Dr. Boyman's office, Plaintiff reported that she was still sore. During an October 7, 2010 call, Plaintiff again reported pain while doing certain activities such as grocery shopping.  Shortly thereafter she reported that she was moving from one residence to another, and that her incision caused her pain while she was packing and unpacking her belongings.

During a November 2010 post-surgical follow-up, Dr. Boyman suggested that internal stretching from the adhesions was causing myofascial pain, meaning that the muscles surrounding the adhesions were acting in ways that could cause additional pain. Plaintiff was not taking medication at that time, and reported feeling well overall.

In December 2010, Plaintiff had an initial visit with primary care physician Dr. Terry Cantlin.  During that visit, Plaintiff mentioned increased lower abdominopelvic discomfort.  A subsequent ultrasound showed a cyst on her right ovary.  In March 2011, Plaintiff visited gynecologist Beth Vermont, M.D, who noted abdominal tenderness.  Dr. Vermont suggested hormonal therapy to shrink the cyst, but Plaintiff believed the therapy might aggravate her migraines.  Dr. Vermont also suggested a diagnostic

laparoscopy to try to identify the source of pain.

In May 2011, Plaintiff again complained to Dr. Boyman of significant pain, at which time Dr. Boyman noted that pelvic pain was prohibiting Plaintiff from working.  Plaintiff applied for SSDI in June 2011, and Dr. Boyman wrote a letter supporting the application, stating that Plaintiff was "currently unable to do any work due to significant pain."  Dr. Boyman also noted her "hope and expectation that this will not be a permanent condition."  Plaintiff contends that Dr. Boyman's notes make clear that any optimism about possible improvement was based upon the expected success of physical therapy for the myofascial pain, and that physical therapy was not expected to address the pain resulting from the underlying adhesions.

In July 2011, Plaintiff met with gynecologist Dr. Tanya Kalmar.  During that exam, Dr. Kalmar noted that Plaintiff's abdomen was not tender and that she had no guarding or rigidity. Plaintiff was also estimated to be 13 weeks pregnant.

In November 2011, state agency physician Dr. Carl Runge reviewed Plaintiff's medical records.  Dr. Runge determined that in an eight-hour workday, Plaintiff could sit for six hours and lift and carry up to ten pounds.  He saw no limitations in her ability to use her hands, climb stairs, balance, kneel, crouch, or crawl.  Dr. Runge also opined that Plaintiff would need to change positions for five minutes every hour to relieve pain.

In December 2011, Plaintiff met with gynecologist Dr.
Lawrence Slocki.  Dr. Slocki reviewed her medical records,
including the pictures of her adhesions.  Although he noted
previous pelvic pain, he reported that Plaintiff did not report
having much pain at that time.  Aside from Plaintiff's obesity,
Dr. Slocki concluded that the physical examination was
unremarkable.

Plaintiff had another C-Section on March 15, 2012.  The
operating physician, Dr. Dina Levin, again removed some of
Plaintiff's adhesions.  In April 2012, Plaintiff complained of
abdominal pain and requested a refill of her oxycodone
prescription.  Dr. Levin noted that Plaintiff seemed "awfully
well" and that her wound was healing.  Approximately one week
later, Plaintiff again complained of pain, but Dr. Levin did not
believe that the pain was from the adhesions.  Dr. Levin
suggested physical therapy, and expressed concern that Plaintiff
might be showing "some functional and drug seeking behavior."
Nonetheless, Dr. Levin refilled Plaintiff's oxycodone
prescription.

In May 2012, state agency physician Dr. Andrew Przybyla
reviewed Plaintiff's records and determined that she could stand
for four hours, sit for six hours and lift and carry up to ten
pounds.  Like Dr. Runge, Dr. Przybyla believed that Plaintiff
would need to change positions once per hour to relieve her pain.

Plaintiff criticizes Drs. Przybyla and Runge for not listing specialties, and for overstating the importance of Dr. Boyman's comment in 2011 that Plaintiff's condition was not likely to be permanent.

Plaintiff returned to Dr. Levin in May 2012 complaining that her pain tended to get worse with activity.  Although Dr. Levin was skeptical of Plaintiff's complaints given her examination and Plaintiff's movements on that day, she again refilled Plaintiff's oxycodone prescription.  Dr. Levin also completed a questionnaire in which she confirmed that Plaintiff frequently experienced pain or fatigue that interfered with attention and concentration, but that Plaintiff could sit, stand and walk in a work setting.  In fact, Dr. Levin observed that Plaintiff could get up from a lying position "quite easily" and was able to walk normally.  She also stated in the questionnaire that Plaintiff did not have any significant limitations with respect to her ability to reach, handle, or lift.

Plaintiff criticizes Dr. Levin's conclusions, in part because Plaintiff was on narcotics at the time of Dr. Levin's observations.  Plaintiff also notes that her insured period ended on March 31, 2011, and the Dr. Levin's examinations occurred after that date.

In June 2012, Plaintiff visited the office of Dr. Brent Burgee.  Dr. Burgee suggested physical therapy and recommend a

6

pain management specialist for what Plaintiff reported as "disabling" pain.  He did not prescribe any medication.  That same month (June 2012), Plaintiff was evaluated by physical therapist Jane Kaufman.  Plaintiff reported that pain prevented her from lifting her 30-pound daughter and inhibited her movements.  Plaintiff was discharged from physical therapy after only a few appointments because she did not keep her last appointment and did not return calls to reschedule.

In September 2012, Plaintiff had a pain management evaluation with Dr. Gilbert Fanciullo.  At that time, Plaintiff stated that her pain was a five out of ten though averaged a seven out of ten.  Dr. Fanciullo noted that she had normal spinal motion and normal strength in her upper and lower extremities.  He also noted tenderness in her right lower abdomen.  For treatment, Dr. Faniciullo recommended Cymbalta, gabapentin and oxycodone, as well as exercise to lessen the pain.

The hearing before the ALJ occurred in January 2013.  As of the hearing, Plaintiff was still reporting severe pain.  That same month, Dr. Boyman completed an impairment questionnaire at Plaintiff's request.  Dr. Boyman opined that Plaintiff could sit for up to one hour and stand for up to one hour in an eight hour workday, and would require breaks every 20 minutes to avoid pain.  Dr. Boyman also stated that Plaintiff was unable to push, pull, kneel, bend, or stoop.

In May 2014, Dr. Boynan submitted a note stating that physical therapy was not providing much benefit and that Plaintiff continued to suffer pain.

## II.  Hearing Testimony

At the January 16, 2013 hearing before the ALJ, Plaintiff claimed that she was disabled due to abdominal pain.  She stated that she was taking Advil, and would like to be on stronger medication but was reluctant because she was breastfeeding her baby.  While her husband was in law school, Plaintiff took care of her two children.  Caretaking included preparing simple meals, sweeping, washing dishes, and folding laundry.  Plaintiff stated that she needed help scrubbing, getting the laundry into the washing machine, lifting, and taking care of her daughter.

Plaintiff does not drive, as she never obtained her license. She does travel to the grocery store and Walmart, and visits family.  She also testified that she pays bills, has a savings account, and uses a checkbook.  Plaintiff tried working for her husband for a short period but reportedly had difficulty concentrating.

Vocational Expert James Parker testified with respect to a hypothetical individual who could sit for six hours, stand and walk up to four hours per day, lift up to ten pounds, was not limited with respect to the use of her hands or feet, and would need to change positions every hour for about five minutes.

According to Mr. Parker, such an individual could work as a data
review clerk, an inspection table worker, and an information
clerk.  Those types of jobs are reportedly available both
nationally and in Vermont.

## III. The ALJ's Decision

The Commissioner uses a five-step sequential process to
evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377,
380-81 (2d Cir. 2004).  The first step requires the ALJ to
determine whether the claimant is presently engaging in
"substantial gainful activity."  20 C.F.R. §§ 404.1520(b),
416.920(b).  If the claimant is not so engaged, step two requires
the ALJ to determine whether the claimant has a "severe
impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ
finds that the claimant has a severe impairment, the third step
requires the ALJ to make a determination as to whether that
impairment "meets or equals" an impairment listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§
404.1520(d), 416.920(d).  The claimant is presumptively disabled
if his or her impairment meets or equals a listed impairment.
*Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is
required to determine the claimant's residual functional capacity
(RFC), which means the most the claimant can still do despite his
or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§
404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The
fourth step requires the ALJ to consider whether the claimant's
RFC precludes the performance of his or her past relevant work.
20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth
step, the ALJ determines whether the claimant can do "any other
work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears
the burden of proving his or her case at steps one through four,
*Butts*, 388 F.3d at 383; and at step five, there is a "limited
burden shift to the Commissioner" to "show that there is work in
the national economy that the claimant can do," *Poupore v.
Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the
burden shift to the Commissioner at step five is limited, and the
Commissioner "need not provide additional evidence of the
claimant's [RFC]").

Here, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since May 31, 2008, the alleged
onset date.  At step two, he found that she had severe
impairments, including adhesions causing chronic pelvic and
myofascial pain, and obesity (Plaintiff had reported her height
as 5'3" and her weight as 215 pounds).  At step three, the ALJ
found that Plaintiff did not have any impairments that, either
singly or in combination, equaled a listed impairment.  He also
determined that Plaintiff had residual functional capacity that

10

included the ability to perform sedentary work; no limitations on the ability to use her hands; the ability to lift ten pounds; and the ability to occasionally stoop and climb ladders, ropes or scaffolds.  The ALJ allowed that if working, Plaintiff would need to change positions every hour for approximately five minutes.

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work.  And at step five, based upon the testimony of the vocational expert, the ALJ concluded that Plaintiff could perform work that exists in significant numbers in the national economy, and that she was therefore not disabled from May 31, 2008 through the date of the decision.

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that her "impairments are of such severity that [she] is not only unable to do [her] previous work[,] but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

11

423(d)(2)(A).

In considering a Commissioner's disability decision, the Court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The Court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.

## Discussion

Here, Plaintiff criticizes the ALJ's ruling on two related points.  First, she argues that the ALJ failed to assess whether Dr. Boyman's opinion as to disability deserves controlling weight under the treating physician rule.  Second, she submits that Dr.

Boyman's opinion deserves controlling weight, and that the evidence therefore supports an award of benefits.

The treating physician rule generally requires a measure of deference to the medical opinion of a claimant's treating physician.  20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding the validity of regulations codifying the treating physician rule).  Under the treating physician rule, a treating source's opinion is generally entitled to "'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  In conducting this analysis, the ALJ must provide "good reasons" for adopting or rejecting a treating physician's opinion.  20 C.F.R. § 404.1527(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A claimant . . . who knows that her physician has deemed her disabled[ ] might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied").  The failure to provide good reasons for rejecting a treating source's opinion is a ground for remand.  *Burgess*, 537 F.3d at 129–30.

In the process of providing "good reasons" for discounting a treating physician's view, the ALJ is required to consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *see Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Sellian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  That said, the ALJ need not "slavish[ly] recit[e] . . . each and every factor where [his] reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also Khan v. Astrue*, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013).  Instead, the ALJ need only apply "the substance of the treating physician rule." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

In this case, the ALJ considered Dr. Boyman's opinions and afforded them "limited weight."  The ALJ explained in detail that he was discounting Dr. Boyman's opinions because: (1) they were internally inconsistent to the extent that she declared Plaintiff "totally disabled" but also believed that the condition was not permanent; (2) her opinions were based largely upon Plaintiff's

subjective allegations; and (3) her conclusions were contradicted
by Plaintiff's activities, which included caring for her two
children while her husband was attending law school.  The ALJ
also noted a lack of consistent complaints to other health care
providers and Plaintiff's limited work history.  With respect to
Dr. Boyman's conclusion that Plaintiff was unable to work, the
ALJ dismissed this finding as a legal determination that is
"reserve[d] to the Commissioner."

Beginning with the question of subjective complaints, the
ALJ is correct that much of the evidence of pain derives from
Plaintiff's own reporting.  Multiple providers acknowledged the
existence of adhesions as the likely cause of pain.  The extent
of the pain, however, and its limiting effects were largely self-
reported.

Under the Social Security Act, "[a]n individual's statement
as to pain or other symptoms shall not alone be conclusive
evidence of disability[.]"  42 U.S.C. § 423(d)(5)(A).  The
regulations at 20 C.F.R. § 404.1529(c)(3) set forth seven factors
that are relevant in assessing credibility: (1) daily activities;
(2) location, duration, frequency, and intensity of pain or other
symptoms; (3) precipitating and aggravating factors; (4) type,
dosage, effectiveness, and side effects of medication; (5)
treatment, other than medication, used for relief of pain or
other symptoms; (6) any measures used to alleviate pain or other

symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  The Social Security regulations also provide a two-step process for evaluating a claimant's subjective complaints.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  *Id.*  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (alterations and emphasis in original).  In other words, the ALJ must examine the record as a whole to determine the credibility of a claimant's subjective complaints.  *See Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985) (the ALJ may weigh "the objective medical evidence in the record, the [plaintiff's] demeanor, and other indicia of credibility").

"It is the function of the [ALJ], not [the court], to resolve evidentiary conflicts and to appraise the credibility of

witnesses, including the [Plaintiff]." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier*, 606 F.3d at 49 (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). The ALJ "is not required to accept [Plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.*

In this case, there is objective evidence of a medically determinable impairment in the form of Plaintiff's adhesions. Drs. Boyman, Levin and Slocki each believed that the adhesions could be related to Plaintiff's reported pain, though pain was at times attributed to an ovarian cyst. Dr. Boyman believed that the muscles around the adhesions were an additional source of pain.

Regardless of the cause, Plaintiff's efforts to alleviate that pain have been inconsistent. When physical therapy was recommended, Plaintiff did not continue with her therapy and did not communicate with therapy provider about termination. Aside from Dr. Boyman's comment in 2014 about the effectiveness of physical therapy, there is no indication in the record that the

termination of physical therapy was approved or recommended by a health care provider.  Plaintiff also declined to follow through on a recommended laparoscopy and resisted hormonal therapy.  As noted by Dr. Levin, Plaintiff did request narcotics, which prompted Dr. Levin to question the credibility of her complaints.

Plaintiff's subjective complaints to providers were similarly uneven.  While her complaints to Dr. Boyman about pain levels were relatively consistent, other providers noted that Plaintiff presented with only mild pain.  Physical examinations were also inconsistent as to abdominal tenderness, guarding, and rigidity.

With respect to Dr. Boyman's opinions specifically, it is clear from the record that the ALJ considered the frequency, length, nature and extent of treatment, as his decision reviewed Plaintiff's medical history in significant detail.  The ALJ also considered the amount of medical evidence supporting Dr. Boyman's opinion, and found her blanket statements about disability to be inconsistent with other portions of the record.  For example, Dr. Levin's views differed significantly from those of Dr. Boyman, and other providers offered varied opinions about the extent of Plaintiff's pain.

Additional evidence in the record arguably belies Dr. Boyman's conclusions about Plaintiff's physical capacity, including Plaintiff's own description of her daily activities.

Plaintiff was able to care for two young children while her
husband attended law school.  She also reported a physical
ability to grocery shop and visit family.  These reports are
inconsistent with Dr. Boyman's suggestion that Plaintiff is
unable to engage in any sort of pushing, pulling, kneeling or
bending activities.  AR at 733 (Multiple Impairment
Questionnaire).  The Court therefore finds that the ALJ properly
limited the weight of Dr. Boyman's comments on these issues.  *See
Poupore*, 566 F.3d at 307 (substantial evidence supported ALJ's
decision opposing treating source where there was evidence that,
*inter alia*, the claimant took care of his one-year-old child,
vacuumed, washed dishes, watched television, read, used the
computer, and drove occasionally).

Not surprisingly, the clearest opinions on the question of
residual functional capacity came from the non-treating
physicians.  Those experts addressed various work-related
activities such as sitting, standing, lifting, and reaching, as
well as Plaintiff's ability to use her extremities.  The ALJ
considered the non-treating expert opinions to be consistent with
Plaintiff's activities, her caring for her family, and "the
limited complaints and objective findings."  The ALJ also noted
that the only weight limitation mentioned in the record was
Plaintiff's inability to life her 30-pound daughter.  The ALJ
therefore found that their conclusions were "not inconsistent

with the medical evidence as a whole" and accorded their opinions
"substantial weight" on the question of residual functional
capacity.

Although the treating physician rule generally requires
deference to the medical opinion of a claimant's treating
physician, the treating physician's opinion is not afforded
controlling weight where it is inconsistent with other
substantial evidence in the record, such as the opinions of other
medical experts. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d
Cir. 2002) (treating physician's opinion is not controlling when
contradicted "by other substantial evidence in the record"); 20
C.F.R. § 404.1527(d)(2).  Here, the ALJ considered Dr. Boyman's
conclusions in light of the entire record and reasonably
concluded that the evidence was not consistent with some of her
conclusions.  The ALJ considered numerous factors in reaching his
decision, and thus provided "good reasons" for discounting the
opinion of the treating physician.

In the end, the ALJ concluded that Plaintiff was able to
perform sedentary work so long as she could change positions
every hour.  Substantial evidence supports this assessment.
Plaintiff herself testified that she leaves the house to shop or
visit family, cares for her two children independently, manages
finances, and performs simple chores such as meal preparation,
sweeping, and washing dishes.  The ALJ provided a detailed

analysis of the record, and in that context expressed his doubts about Plaintiff's reported limitations.  Because substantial evidence supports those doubts, the Court affirms the ALJ's conclusion.

## **Conclusion**

For these reasons, the Court DENIES Plaintiff's motion (Doc. 17), GRANTS the Commissioner's motion (Doc. 25), and AFFIRMS the decision of the Commissioner.

DATED at Burlington, in the District of Vermont, this 6th day of December, 2016.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
District Court Judge